## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER, | § § § § § § | Civil Action No. 5:22-cv-400 |
| | § § | |
| Plaintiffs, | § § | |
| | § | |
| v. | § § | |
| | § | |
| LLANO COUNTY, RON CUNNINGHAM, in his official capacity as Llano County Judge, JERRY DON MOSS, in his official capacity as Llano County Commissioner, PETER JONES, in his official capacity as Llano County Commissioner, MIKE SANDOVAL, in his official capacity as Llano County Commissioner, LINDA RASCHKE, in her official capacity as Llano County Commissioner, AMBER MILUM, in her official capacity as Llano County Library System Director, BONNIE WALLACE, in her official capacity as Llano County Library Board Member, ROCHELLE WELLS, in her official capacity as Llano County Library Board Member, RHONDA SCHNEIDER, in her official capacity as Llano County Library Board Member, and GAY BASKIN,  in her official capacity as Llano County Library Board Member, | § § § § § § § § § § § § § § § § § § § § § § § | **COMPLAINT** |
| | § § | |
| Defendants. | § | |

## <u>INTRODUCTION</u>

1.     Plaintiffs are adult residents of Llano County and visitors, users, card-carrying members, and ardent supporters of Llano County's public libraries. More than a gathering space

for topical lectures, group meetings, and crafting projects, Llano County's public libraries provide Plaintiffs and other community members with a quiet and contemplative space to explore the marketplace of ideas and pursue the knowledge contained within the books on library shelves. Though Plaintiffs differ in their ages, professions, and individual religious and political beliefs, they are fiercely united in their love for reading public library books and in their belief that the government cannot dictate which books they can and cannot read.

2.      Defendants are Llano County public officials who control which books are available at Llano County public libraries. Notwithstanding Llano County's library collection policy, which provides that "in no case should any book be excluded because of race or nationality or the political or religious views of the writer," and that "there should be the fullest practicable provision of material presenting all points of view concerning the problems and issues of our times," Defendants have been systematically removing award-winning books from library shelves because they disagree with the ideas within them. Defendants have also permanently terminated access to over 17,000 digital books because they could not censor and ban two specific ebooks that they disliked from the County's digital book collection.

3.      The censorship that Defendants have imposed on Llano County public libraries is offensive to the First Amendment and strikes at the core of democracy. The right to publish and receive ideas—even politically unpopular ideas or ones that some find offensive or distasteful— is enshrined in our Constitution. As the Supreme Court has said, "freedom of thought and speech 'is the matrix, the indispensable condition, of nearly every other form of freedom.'" *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 264 (1986) (citation omitted).

4.      Publicly, Defendants claim to be on a hunt to eradicate "pornographic" materials. This is a pretext; none of the books Defendants have targeted is pornographic. Many of these books have received prestigious literary awards and national acclaim, and many involve contemporary political issues. Such books include, for example, *Caste: The Origins of Our Discontent*, by Pulitzer Prize winning journalist Isabel Wilkerson, *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, by Susan Campbell Bartoletti, and *Spinning*,

by Eisner Award winner Tillie Walden. Privately, Defendants have admitted that they are banning books because they disagree with their political viewpoints and dislike their subject matter.

5.      But even books that are not nationally acclaimed should not be banned because of their content or viewpoint. The First Amendment exists "to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]" *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). Unfortunately, Defendants have done just that—prescribed which public library books Llano County residents can and cannot read based on the viewpoints and ideas contained within those books.

6.      Public libraries are not places of government indoctrination. They are not places where the people in power can dictate what their citizens are permitted to read about and learn. When government actors target public library books because they disagree with and intend to suppress the ideas contained within them, it jeopardizes the freedoms of everyone.

7.      Each day that Defendants are censoring books at Llano County public libraries, Plaintiffs are suffering irreparable injury. Plaintiffs bring this action for prospective injunctive relief to end Defendants' efforts to monopolize the marketplace of ideas, and to ensure that once again there will "be the fullest practicable provision of material presenting all points of view concerning the problems and issues of our times," for all Llano County library patrons.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate rights protected by the First and Fourteenth Amendments to the United States Constitution.

9.      This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside within and/or perform official duties within the Western District of Texas. This Court, accordingly, has personal jurisdiction over Defendants.

## THE PARTIES

### A.     Plaintiffs

11.     Plaintiffs read library books for their personal and professional enrichment and enjoyment. They are also members of social book clubs as well as non-profit community groups dedicated to fundraising for and supporting Llano County's public libraries. Plaintiffs check out and read books on a wide variety of topics, including both fiction and nonfiction titles, and at various reading levels, including adult, young adult, and children's books. Some Plaintiffs also check out children's books to read to and with their children and grandchildren.

12.     Plaintiff Leila Green Little resides in Llano County and comes from generations of Llano County public library patrons and enthusiasts. As a result, public libraries have been an extremely important part of her life, from childhood throughout college, during her career, and especially now as a parent. She takes her children to activities at all branches of the Llano County Library System, reads to and with her children daily, and has a current penchant for nonfiction books.

13.     Plaintiff Jeanne Puryear has resided in Llano County for two decades and has been a card-carrying member of the Llano County Library System ever since. When she moved to Llano County in the early 2000s, she quickly found community in the County's public libraries. She has been a faithful patron of libraries since childhood and was pleasantly surprised to learn that Llano County's public libraries offered even more opportunities for reading and social engagement than the libraries she patronized before arriving here. She considers the public library her home away from home and reads an assortment of books.

14.     Plaintiff Kathy Kennedy has been a resident of Llano County for fifteen years, and obtained her Llano County public library card shortly after arriving. She has been a book lover since her childhood, and has fond memories of reading classics such as *1984*, *Fahrenheit*

*451*, *To Kill a Mockingbird*, and *Brave New World* with a very special teacher who encouraged her to read all kinds of books. She continues to be an avid reader and lover of books.

15.    Plaintiff Rebecca Jones has lived in Llano County for over two decades. Shortly after moving to Llano, she met her first local friends at and became a card-carrying member of the Llano County public library. She was raised in a home where no book was forbidden, and her mom would express interest in and initiate frequent discussions about her book selections from the local public library. As a voracious reader of both fiction and nonfiction, she takes her out-of-town visitors to experience Llano County's public libraries along with her.

16.    Plaintiff Richard Day is a retired physician. He has resided in Llano County for seven years and checks out books in the Llano County Library System. Before attending medical school, he received a master's degree in Library and Information Science from the University of Texas at Austin. He previously worked as a rare book cataloger at the Moody Medical Library at the University of Texas Medical Branch in Galveston. He also worked at the University of Texas Health Sciences Center at San Antonio as the head of cataloging, a reference librarian, and as medical liaison librarian to the pediatrics department.

17.    Plaintiff Cynthia Waring toured Llano County's public libraries even before moving there. Eight years ago, she got her Llano County library card promptly after closing on her house. She was seven years old when she discovered that libraries, books, and kind librarians were a refuge from the storm of her home life, and has carried this regard for libraries ever since. She is an active patron of the public libraries in Llano County and supports several local organizations that help fundraise for Llano County's public libraries.

18.    Plaintiff Diane Moster moved to Llano County five years ago, and one of the first things she did was join the public library. She is an avid reader, and checks out library books on a variety of subjects, including gardening, cooking, history, and fiction. She takes her grandchildren to the public libraries every time they visit her in Llano County.

**B.      Defendants**

19.      Defendants are (i) Llano County; (ii) the members of the Llano County Commissioners Court, which is the municipal entity that controls, among other things, which books are available in Llano County libraries; (iii) the Llano County Library System Director, who is also responsible for which books are provided in Llano County's public libraries; and (iv) members of the Llano County Library Board, an entity created by the Commissioners Court to, among other things, effectuate the Commissioners Court's policies. Defendants are being sued in their official capacities.

20.      In particular, Defendant Ron Cunningham is an elected official and final policymaker that serves as the head of the Llano County Commissioners Court. He is being sued in his official capacity as Llano County Judge.

21.      Defendants Jerry Don Moss, Peter Jones, Mike Sandoval, and Linda Raschke are elected officials and final policymakers that serve on the Llano County Commissioners Court. They are each being sued in their official capacities as Llano County Commissioners.

22.      Under Texas law, the Llano County Library System is under the general supervision of the Commissioners Court, and therefore, the general supervision of Defendants Cunningham, Moss, Jones, Sandoval, and Raschke. *See* Tex. Loc. Gov't Code § 323.006.

23.      Defendant Amber Milum is the Llano County Library System Director. Under Texas law, Defendant Milum is a final policymaker required to "develop and manage the library in accordance with accepted rules of library management and [] determine which books and library equipment will be purchased." Tex. Loc. Gov't Code § 323.005. She is being sued in her official capacity as the Llano County Library System Director.

24.      Defendants Bonnie Wallace, Rochelle Wells, Gay Baskin, and Rhonda Schneider are appointed members of the County Library Board, which was created by the Commissioners Court to create and effectuate County policy. Defendants Wallace, Wells, and Baskin do not have degrees or prior professional experience in library sciences. Defendant Schneider

previously worked as the teen librarian at the County's Llano Library Branch until mid-2021. They are each being sued in their official capacities as Llano County Library Board members.

26. Defendants acted under color of state law to engage in viewpoint discrimination in violation of the First Amendment by ordering the restriction and removal of library books that they subjectively disagreed with or disliked.

26. Defendants also acted under color of state law to deprive Llano County citizens of procedural due process in violation of the Fourteenth Amendment by, among other things, intentionally blocking public access to Library Board meetings, adopting and implementing library collection and reconsideration policies without final approval of the Commissioners Court or the Llano County Library System Director, and denying the public of proper notice and the opportunity to be heard before restricting and removing library books.

## FACTUAL BACKGROUND

### A.  The Llano County Library System

27. The public libraries in Llano County are the cultural heart of the Llano community. These libraries provide spaces for residents of all different ages, professions, income levels, values, beliefs, religions, and political affiliations to come together in quiet pursuit of knowledge and the exploration of ideas.

28. The Llano County Library System has three libraries in three physical locations: the Llano Library Branch (the main branch), the Kingsland Library Branch, and the Lakeshore Library Branch.

29. Prior to the events giving rise to this lawsuit, the Llano County Library System provided library cardholders with a digital catalog called "OverDrive," which gave library patrons access to a curated collection of over 17,000 digital ebooks and audiobook titles. This service was widely and heavily used by the Llano community, particularly by elderly patrons who struggle to read books in print and listen to audiobooks instead, as well as by patrons with physical disabilities that make accessing a physical library location difficult.

30.     Plaintiffs are card-carrying members and visitors of all three Llano County public library branches. Many Plaintiffs also checked out ebooks and audiobooks on OverDrive before Defendants permanently terminated access to it.

**B.     The Llano County Library System's Materials Selection and Removal Policies Are Viewpoint Neutral and Require a Breadth and Balance of Books**

31.     In August 2006, the Commissioners Court adopted the Llano County Library System's Materials Selection Policy ("Materials Policy"), which governs the process by which librarians are to curate the books in the County's library collection.

32.     The stated goal of the Materials Policy is "maintain[ing] a well-balanced and broad collection of materials for information, reference, research, and enjoyment" and "support[ing] the democratic process by providing materials for the education and enlightenment of the community."

33.     The Materials Policy also incorporates the American Library Association's Library Bill of Rights, which states, in part:

> "In no case should any book be excluded because of race or nationality or the political or religious views of the writer. There should be the fullest practicable provision of material presenting all points of view concerning the problem and issues of our times ... international, national and local; and media or other reading material of sound factual authority should not be proscribed or removed from the library shelves because of partisan or doctrinal disapproval."

34.     Pursuant to the Materials Policy, "[r]esponsibility for the reading of children rests with their parents or legal guardians. Selection should not be inhibited by the possibility that media may inadvertently come into possession of children." It continues that "[m]aterials with an emphasis on sex, or containing profane language should not be automatically rejected. Selection should be made on the basis of whether the media presents life in its true proportions, whether characters and situations are realistically presented, and whether the media has literary value."

35.     In accordance with the Materials Policy, the Llano County Library System does not and cannot select pornographic materials for its collection.

36.     The Materials Policy also contains a provision governing requests to remove particular library materials from Llano County's collection. This provision states that a "patron's

choice of library materials for personal use will be an individual matter," and "[w]hile a person may reject materials for himself or herself and for his or her children, he or she shall not exercise censorship to restrict access to the materials by others."

### C. Defendants Embark on a Campaign of Censorship and Viewpoint Discrimination

37.     In or about the summer of 2021, Defendants initiated a coordinated censorship campaign to remove and restrict access to a wide array of books—many of which have received numerous national and international awards—in Llano County Library System's physical and digital collection in contravention of the County's existing Materials Policy and Plaintiffs' First Amendment rights.

38.     Defendants' censorship campaign targeted books that conflicted with Defendants' subjective opinions, as well as their political and religious views.

39.     Defendants claimed that the goal of their censorship campaign was to protect the community's children from graphic sexual and "pornographic" materials. In reality, none of the books targeted by Defendants is pornographic or obscene.

40.     Before each of the books targeted by Defendants was made available to the general public, it was assessed and vetted by a trained librarian in accordance with Llano County Library System's Materials Selection Policy and other professional standards created by the American Library Association and the Texas Library Association. All of these standards and policies prohibit the collection or distribution of pornographic or obscene materials.

41.     Further evidence that Defendants' actions were undertaken to censor ideas and viewpoints with which they disagreed—and had nothing to do with protecting children from nudity and "pornography"—lies in the many books that Defendants chose to leave on library shelves, including books with: (i) depictions of nudity, such as the *Art of Rembrandt*, a reference book in the Llano Library Branch that sits on a table in plain sight for public viewing; (ii) sexual references, such as *My Teen Has Had Sex, Now What Do I Do?*; and (iii) graphic sex scenes,

such as *A Game of Thrones*, *The Canterbury Tales*, *Lady Chatterley's Lover*, and books in the *Outlander* series by Diana Gabaldon, including *Outlander*, *Voyager*, and *The Fiery Cross*.

42.    Defendants implemented their censorship campaign by employing the following tactics:

- removing books they disapproved of from library shelves;

- moving young adult and children's books they disapproved of to the adult section of the library;

- restricting access to books by hiding them out of sight behind the front desk or in County employees' offices;

- terminating OverDrive access permanently;[1]

- issuing an indefinite moratorium on all new book purchases;

- firing previous library board members and replacing them with ideologically and politically aligned appointees (the "New Library Board");

- tasking the ideologically motivated New Library Board with creating amended collection and removal policies, and requiring the New Library Board to pre-approve all future book purchases proposed by librarians;

- referring to the New Library Board as "advisory" in an attempt to evade compliance with the Texas Open Meetings Act ("TOMA") and Texas Public Information Act ("TPIA");

- banning Llano County's librarians from attending meetings of the New Library Board;

- directing the New Library Board to operate behind closed doors outside of public scrutiny;

---

[1] Hereafter, all print titles that Defendants physically removed from library shelves, as well as the two digital titles that resulted in Defendants' permanent termination of OverDrive, will be collectively referred to as the "Banned Books."

- refusing to produce records related to their censorship campaign in response to a properly served TPIA request; and

- firing the head librarian of Kingsland Library, Suzette Baker, for "insubordination" after she questioned and refused to comply with Defendants' censorship requests.

**D.    Defendants Target and Remove Children's Books**

43.    In or about August 2021, Defendants Amber Milum, Jerry Don Moss, and Ron Cunningham removed several children's picture books about bodily functions and depicting nudity from the library's collection in response to complaints from a group of community members that these books were "inappropriate." Among those who complained about the children's picture books were Defendants Rochelle Wells, Rhonda Schneider, and Bonnie Wallace, who had not, at that time, been appointed to the New Library Board.

44.    Children's books that Defendants removed from the library include, for example, Maurice Sendak's *In the Night Kitchen* and Robie H. Harris's *It's Perfectly Normal: Changing Bodies, Growing Up, Sex, and Sexual Health*.

45.    *In the Night Kitchen* is a picture book featuring a boy's dream journey through a baker's kitchen, where he helps bake a cake that must be ready by morning. He appears nude in the book after falling out of his clothes and into a bowl of cake batter. The book has received numerous awards, including the 1971 Caldecott Honor Book, the American Library Association's Notable Children's Books of 1940-1970, and the Outstanding Children's Books of 1970, and Best Illustrated Children's Books of 1970 by the *New York Times*.

46.    *It's Perfectly Normal* is a well-known and award-winning sex education book with color illustrations of the human body, designed for parents and children ages ten and older. It is the product of the author's extensive research and interviews with experts in the fields of medicine, psychiatry, child development, education, and parenting. It deals with biological subjects of immediate importance and concern to pre-teens and teenagers in an accurate,

thorough, balanced, and honest manner. It has received starred reviews[2] from publications such as School Library Journal, The Bulletin for the Center of Children's Books, and Booklist, and has won many awards, including an American Library Association Notable Book, a *New York Times* Best Book of the Year, and a *Boston Globe* Horn Award for a non-fiction title. In 1997, the *Philadelphia Inquirer* published an article in its Sunday Magazine about a ten-year-old girl who was able to discover and report that she was being sexually abused after reading *It's Perfectly Normal*.

47.    In or about the fall of 2021, some Plaintiffs attempted to check out these two books from the library but were told by Defendant Milum that they were in Defendant Cunningham's office and could not be checked out.

48.    On January 19, 2022, after being appointed to the New Library Board, Defendant Rochelle Wells sent Defendant Jerry Don Moss an email referring to these children's books as "disgusting" and thanked Defendant Moss for removing them.

49.    Defendants also censored several popular read-aloud picture books aimed at amusing kids, including, for example, *My Butt Is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!*, and four seasonal books for children, including *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Has Too Many Farts* (the "Health Education Picture Books").

50.    These books are highly rated and include silly themes and rhymes to make reading appealing for young children and to teach them about their bodies. For example, *Freddie the Farting Snowman* has 4.8 stars and over 1,900 reviews on Amazon.com, many of which explain the important purpose of the series. As one such reviewer wrote in mid-2021: "If you

---

[2] A "starred" review is given by a literary publisher, editor, or industry reviewer that denotes a book of distinction or particularly high quality. School Library Journal, for example, describes its starred reviews as given to "a book that is either outstanding and unlike anything we've seen before OR it's an excellent example of that particular genre or format. When we give something a star, it means that we believe that *almost* every library should have it in their collection–or at least seriously consider it for purchase."

have a kiddo who is struggling to find interest or motivation to read, these are SUCH a great series to make reading FUN! Our 6yr old is a perfectionist, so when she wasn't quite meeting her [reading] standards we really struggled to find how to motivate her and it broke my heart. This series was IT!!"

51.     Defendant Milum stated in an email to Defendant Moss that, given the community complaints and controversy surrounding other children's books, she independently decided to remove the Health Education Picture Books from library shelves and hide them in her office filing cabinet—after she had already purchased and entered them into the library's catalog.

52.     Plaintiffs had no notice or opportunity to be heard before these books were removed and censored. Defendant Milum simply took them off library shelves and deleted them from the collection catalog.

### E.     Defendants Move Children's Books to the Adult Section of the Library

53.     In or about October 2021, the pro-censorship faction of the community—which included many people who would later be appointed as members of the New Library Board, such as Defendants Schneider, Wallace, and Wells—asked Llano County's librarians to move certain books intended for children and teens into a segregated shelf in the adult section of the library because they believed these books were "inappropriate."

54.     In or about mid-October 2021, Suzette Baker, the then-head librarian of the Kingsland Library Branch, emailed Defendant Amber Milum opposing this request, explaining that she believed the librarians should instead "counter [this request] with information on how to effectively see what their children are doing and on how to choose books." The pro-censorship group was undeterred.

55.     A few weeks later, Defendant Wallace (who had not yet been appointed to the New Library Board) sent Defendant Ron Cunningham and others an email repeating this pro-censorship request to hide children's books in the adult section of the library. In the email, Defendant Wallace claimed that certain children's books in Llano County public libraries contained "pornographic filth" and should "be RELOCATED to the ADULT section where a

child would need to get their parent's approval to check out." Defendant Wallace stated that relocating those books into the adult section of the library was "the only way that I can think of to prohibit future censorship of books I do agree with, mainly the Bible, if more radicals come to town and want to use the fact that we censored these books against us."

56.     In or about November 2021, Defendant Milum directed Llano County librarians to move certain "inappropriate" books out of the room designated for children and teens, and onto a shelf in the adult section.

### F.     Defendants Censor Books Based on Representative Matt Krause's List

57.     Emboldened by their successful attack on children's books, Defendants began to broaden the scope of their censorship campaign.

58.     On October 25, 2021, Texas State Representative Matt Krause issued a letter to the Texas Education Agency and various school district superintendents identifying 850 books that Mr. Krause disliked for personal or political reasons (the "Krause List"). Mr. Krause asked the school superintendents to identify whether any of the books on his list appeared on the shelves of their school libraries, and how much money was spent on any such books.

59.     The 850 books on the Krause List include famous and award-winning titles such as *Between the World and Me* and *We Were Eight Years in Power* by Ta-Nehisi Coates, and *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* by Michelle Alexander, as well as other fiction and nonfiction books related to sexuality, sex education, gender identity, racial equality, abortion, and teen pregnancy.

60.     On October 28, 2021, three days after the Krause List was issued, Defendant Milum sent Defendant Cunningham an email entitled, "Critical race theory book." In the body of the email, Defendant Milum wrote:

> I wanted to let you know before it came up in any of your meetings the Kingsland library does have the book. The book is still in the system but it is behind the front desk. If anyone wants to check it out they have to ask a librarian. It is no longer on the shelf.

61.     In or about early November 2021, a group of pro-censorship community members including Defendants Wallace and Wells reviewed Llano County's print and digital library collection to determine which titles on the Krause List were available in Llano County's public libraries. In an email to Defendant Wallace and others describing this review process, Defendant Wells referred to the Krause List not as the "pornographic" or "obscene" books, but as the "16-page list of CRT and LGBTQ book[s]."

62.     On November 10, 2021, Defendant Wallace sent Defendant Cunningham and others an email entitled "Pornographic Filth at the Llano Public Libraries." Attached to Defendant Wallace's email was a spreadsheet of all of the books on the Krause List that were also in Llano County's library collection, referring to the County's book selection process as "atrocious." Defendant Wallace also commented that she would "like all the pastors to get involved in this. Perhaps they can organize a weekly prayer vigil on this specific issue. . . . May God protect our children from this FILTH."

63.     Later that same day, Defendant Cunningham forwarded Defendant Wallace's email to Defendant Milum, copying Defendant Moss and directing Defendant Milum to immediately remove "all books that depict any type of sexual activity or questionable nudity," including books in the library's digital collection. Defendant Cunningham told Defendant Milum to let him and Defendant Moss know when she completed the task.

64.     At or around the same time, Defendant Cunningham also ordered the indefinite suspension of new book purchases. No books have been ordered for the Llano County Library System or put on library shelves since October 2021.

65.     On November 11, 2021, Defendant Wells sent an email to Defendant Wallace and others, copying Defendant Moss and stating:

> Commissioner Moss and Judge Cunningham have instructed Amber [Milum], the head librarian, to remove certain books, both physical books and ebooks (via the LIBBY app). There will also be no new books coming in until this is settled. If you go into the library you will see Amber and Tina (Children's librarian) are currently going through the Children's section, labeling books, and I am assuming also removing the books Commissioner Moss has told them to remove. . . .

Commissioner Moss, we are very grateful for your help in this situation and all you have done to begin to remedy it!

66.     Working off Defendant Wallace's derivative list of Krause List books available in Llano County's collection, Defendant Milum compiled an Excel spreadsheet entitled, "Bonnie Wallace book list 2021.11.12," which listed additional information next to each Krause List book on Llano County shelves, including its call number, its library branch location, and which librarian purchased the book (the "Bonnie Wallace Spreadsheet").

67.     On November 12, 2021—the same date listed on the spreadsheet that Defendant Milum compiled—Defendants removed several books on the Bonnie Wallace Spreadsheet from the Llano Library Branch shelves, including, for example, *Caste: The Origins of Our Discontents*, *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, *Being Jazz: My Life as a (Transgender) Teen*, and *Spinning*. None of these books contain any obscenity or pornography.

68.     *Caste* was written by Pulitzer Prize winning journalist Isabel Wilkerson. *Caste* posits that throughout its history, America has been shaped by a hidden caste system, a rigid hierarchy of human rankings, that influences people's lives and behavior. Wilkerson links this system in America to the caste systems of India and Nazi Germany, and explores common features of caste systems across civilizations. She also points forward to ways America can move beyond the artificial and destructive separations of human divisions, and toward hope in our common humanity. *Caste* has received starred reviews from Kirkus Reviews, Publisher's Weekly, Library Journal, and Booklist, and won numerous literary awards, including the #1 *New York Times* Bestseller, the #1 Nonfiction Book of the Year by *Time*, the *Los Angeles Times* Book Prize and Oprah's Book Club.

69.     *They Called Themselves the K.K.K.* is a nonfiction book that narrates the history and origin of the Ku Klux Klan through various primary sources, including interviews and personal accounts, congressional documents, diaries, photographs, and other historical records. It has received starred reviews from Kirkus Reviews, Publishers Weekly, The Horn Book, Booklist, and School Library Journal. It has also won several literary awards, including the 2011

Booklist Top 10 Black History Books for Youth, the 2010 Kirkus Best Young Adult Books, the 2011 Notable Books for a Global Society, and the 2011 Young Adult Library Services Association's Award for Excellence in Nonfiction Finalist.

70.     *Being Jazz* is a memoir written by a transgender woman, Jazz Jennings, who recounts the bullying, discrimination, and rejection she faced during her teenage years because of her identity. Jennings was the youngest recipient of Equality Florida's "Voice for Equality" Award, was honored and recognized at the 2013 GLAAD Awards, where she met former President Bill Clinton, received the Harvey Milk and Pride Center's Diversity Honors Youth Award in 2015, and was named as one of *Time Magazine*'s Most Influential Teens for 2014-2015, and *Huffington Post*'s 14 Most Fearless Teens of 2014. *Being Jazz* has also received numerous literary awards, including the 2016 Best Books for Teens, the 2016 Booklist Book Review Stars, and the 2017 Rainbow List for Young Adult Nonfiction.

71.     *Spinning* by Tillie Walden is a coming-of-age graphic memoir (*i.e.*, a book told in comic-strip format instead of traditional written prose). It chronicles Walden's adolescence as a competitive figure skater while she navigates moving with her family from New Jersey to Texas, explores her identity and attraction to another girl, and experiences alienation and bullying in her new community. It has received starred reviews from <u>Kirkus Reviews</u>, <u>Publishers Weekly</u>, and <u>Booklist</u>. It has also won numerous literary awards, including the New York City Public Library Notable Best Book for Teens, the Chicago Public Library Best Book of 2017, the 2018 YALSA Great Graphic Novel, the 2017 Booklist Youth Editors' Choice, and the Eisner Award for Best Reality-Based Work, making Walden one of the youngest Eisner Award winners ever at age 22.

72.     Plaintiffs had no notice or opportunity to be heard before the Banned Books were removed and censored. Defendants simply took them off library shelves and deleted them from the collection catalog.

73.     In or about mid-November 2021, Defendant Milum ordered Suzette Baker to remove the Banned Books and all titles on the Bonnie Wallace Spreadsheet from the Kingsland

Library Branch shelves. Ms. Baker refused and told Defendant Milum that removing these books would constitute censorship.

74.     Defendant Milum personally removed at least one other title on the Bonnie Wallace Spreadsheet from the Kingsland Library Branch shelves, *How to Be an Anti-Racist*, and hid it behind the front desk.

### G.     Defendants Close Llano County's Public Libraries for Three Days to Hunt for "Inappropriate" Books

75.     On December 13, 2021, the Commissioners Court voted to close the libraries to the public for three dates from December 20 to December 23, 2021, to conduct a private review of the "appropriateness" of books on library shelves in the teen and children's sections. The Commissioners Court did not define "appropriateness" or otherwise explain the criteria employed in this review.

76.     Although the Commissioners Court declined to define their censorship criteria publicly, Defendant Wells explained in an email that Defendant Moss's plan to close the library for three days was "entirely devoted to removing those books that contain pornographic content," and that she had sent him the Excel spreadsheet with the Krause List titles, commenting: "hopefully that will help also." In the same email, Wells wrote that "Commissioner Don truly is a God-send!!" and that she would be thanking Defendant Jerry Don Moss at the next Tea Party meeting for refusing to meet with a member of the public who had referred to his book removals as "censorship."

77.     On December 14, 2021, Defendant Wells sent an email to Defendants Wallace and Schneider regarding the December 13 Commissioners Court meeting, stating:

> God has been so good to us and given us favor in the eyes of the community and the commissioners. I am very thankful to Him for sending all of you to fight this battle for the protection of the hearts and minds of the kids of Llano. Please continue to pray for the librarians and that their eyes would be opened to the truth.

### H.     Defendants Permanently Terminate Access to OverDrive

78.     In or about November 2021, following the creation and dissemination of the Bonnie Wallace Spreadsheet, Defendants discovered that two books on the Spreadsheet from the

Krause List were accessible to Llano County library patrons on OverDrive, Llano County's curated collection of over 17,000 digital ebooks and audiobook titles. According to emails sent by Defendants Wallace and Wells, they believed that OverDrive contained some of the "worst" titles on the Krause List.

79.     Defendants initially attempted to remove the two Krause List books from OverDrive, but soon realized that OverDrive has no mechanism to remove or restrict access to individual book titles available in its digital consortium.

80.     On December 1, 2021, Defendant Cunningham sent Defendant Milum an email asking various questions about how children could be restricted from accessing OverDrive.

81.     Defendant Milum responded by proposing parental control options that could be implemented on OverDrive to restrict children's access to mature content—controls which would have filtered out the two Krause List books.

82.     Defendant Milum explained to Defendants Moss and Cunningham that discontinuing OverDrive entirely, including for adult users, would "be a disservice to most of our patrons. We have a lot of elderly patrons who only use overdrive and our travelers do as well. I hope these options will be a comfort to parents that there is something that can help."

83.     Over the next two weeks, Defendant Milum and other Llano County librarians continued to attempt to persuade Defendants that the proposed parental controls were sufficient to address any purported concerns about children using OverDrive. Other Llano County librarians, including Suzette Baker, argued that the County's entire adult population should not be precluded from accessing the tens of thousands of books on OverDrive solely because of two Krause List books.

84.     Although OverDrive's parental controls offered a reasonable means to protect children—Defendants' purported reason for wanting to restrict the books in the first place— Defendants rejected this option.

85.     An email sent by Defendant Wells on December 2, 2021, confirms that Defendants would be satisfied only with a digital library collection over which they had

complete and total control. Defendant Wells stated that Defendant Moss's first agenda item for the upcoming December 13, 2021 Commissioners Court meeting was "substituting OverDrive with a system that support[s] our library only, so we choose the books. . . . If that is not an option then no ebooks until it can be remedied."

86. At the December 13, 2021 Commissioners Court meeting, the Commissioners voted unanimously to suspend access to OverDrive for all users—including accounts for both children and adults.

87. On December 14, 2021, Defendant Wells sent an email celebrating the Commissioner Court's decision to suspend OverDrive, exclaiming: "[T]his is where the worst books have been available to minors, so praise God for this immediate solution!"

88. Although the Commissioners' OverDrive suspension was originally framed as a temporary solution, it later became Defendants' permanent solution.

89. Defendants initially researched other options for digital book collections, such as Bibliotheca, but ran into the same problem. As Defendant Cunningham framed it on December 21, 2021: "I understand Bibliotheca is an option, but from what I can see that service also has OverDrive inventory…"

90. Defendants did not suspend OverDrive for financial or economic reasons. In fact, some of the replacement options that Defendants researched would have been more costly on an annual basis than OverDrive.

91. A week after the Commissioner Court's vote, a patron emailed a Llano County librarian asking why OverDrive had been suspended: "[My spouse] says Court stopping overdrive because of books available, critical race theory, etc. I guess money." The librarian responded, "It's not because of money. [Your spouse's] guess is closer."

92. In late December 2021, Defendant Cunningham emailed Defendant Milum stating, "we probably need to turn OverDrive back on for adults."

93. On January 10, 2022, the Commissioners Court instructed Defendant Milum to find a mechanism to prevent minors from accessing OverDrive altogether.

94.     On January 24, 2022, Defendant Milum presented a solution to the Commissioners Court that would have excluded minors from OverDrive and permitted access to adults only. Once again, this solution did not satisfy Defendants. The Commissioners refused to reinstate OverDrive access for adults, and delegated any future decisions regarding OverDrive or a replacement digital book collection to the New Library Board.

95.     Defendants never reinstated OverDrive access for its library patrons. Nor have Defendants replaced OverDrive with any other digital collection of ebooks and audiobooks.

96.     Defendants' decision to terminate OverDrive has had a substantial and profound impact on the Llano County community. In the two years prior, Llano County library patrons collectively checked out over 7,930 titles on OverDrive. Moreover, the termination cut off easy access to library books for the elderly, people with disabilities, and those otherwise unable to visit a physical library in Llano County.

97.     Because Defendants were unable to remove two Krause List books that offended their politics and personal sensibilities, Defendants instead opted to remove access to OverDrive altogether, preventing all library patrons in Llano County from accessing OverDrive's digital collection of more than 17,000 books.

**I.      Defendants Restructure the Library Board and Appoint New Members**

98.      In or about January 2022, the Commissioners Court voted to dissolve the existing library board—whose members came from the Friends of the Library groups and the Women's Culture Club—and packed the New Library Board with political appointees, including many of the people who had advocated for banning the Health Education Picture Books and books on the Krause List, some of whom did not even have library cards prior to their appointment.

99.     In particular, Defendants Baskin, Wallace, Wells, and Schneider were appointed to the New Library Board by the Commissioners Court. It was at this point that Baskin, Wallace, Wells, and Schneider's advocacy shifted from personal expression to making decisions and taking unconstitutional actions under color of state law.

100.    By design, New Library Board members could only be hand-picked by the Commissioners Court. As Wells wrote in an email on December 2, 2021, "[the New Library Board] will be by appointment, not for whoever wants to join - which is good because we were worried about that."

101.    Although several Plaintiffs wanted to be members of the New Library Board, the Commissioners refused to consider them for the position because of Plaintiffs' public stances against ongoing censorship efforts in the County.

102.    Plaintiff Richard Day, for example, was Commissioner Peter Jones's initial appointee for the New Library Board—a decision that was reported in the local paper. Plaintiff Day was more than qualified for the position; he holds a master's degree in Library and Information Science, previously managed the rare books collection at the University of Texas Medical Branch in Galveston, and formerly served on a library board in Wichita Falls. But Commissioner Jones later revoked the appointment, informing Plaintiff Day over the phone that Day was not fit to serve on the New Library Board because of his "politics."

103.    Similarly, Plaintiff Jeanne Puryear, who was on the prior library board before the Commissioners Court voted to fire her and all other board members, was told by Defendant Moss that he would not consider her for the New Library Board because he wanted to bring in entirely new people such as Defendants Wells and Schneider.

104.    Plaintiff Rebecca Jones asked to be considered for the New Library Board through voicemails, emails, and faxes to Defendants Moss and Cunningham. She never received a response.

105.    Plaintiff Leila Green Little wrote a letter to the Commissioners Court formally applying to serve on the New Library Board. In addition to listing her many credentials, she also implored Defendants not to remove access to OverDrive. Plaintiff Little hand-delivered five copies of the letter to the County Commissioners' office—one for each of Defendants Cunningham, Moss, Jones, Sandoval, and Raschke. Plaintiff Little also never heard back.

106.    The Commissioners Court's purported purpose for "restructuring" the New Library Board (*i.e.*, firing and re-appointing new members) was to task the new members with amending existing library policies, including book collection and book removal procedures, and presenting the updated policies and procedures to the Commissioners Court for final approval.

107.    In voting to dissolve the existing library board in or about January 2022, the Commissioners Court also voted to rename it the "Library *Advisory* Board." Notwithstanding this name change, the New Library Board is "advisory" in name only. To date, the New Library Board has made several decisions without receiving the Commissioners Court's final approval.

108.    For example, without oversight by or approval from the Commissioners Court, the New Library Board formed the "Collection Review Committee," an internal committee tasked with reviewing "books that are questionable" and deciding whether or not they are "appropriate" for Llano County's public libraries. There are no designated criteria governing the review of such books, no public notice as to when such books are to be considered by the Collection Review Committee, no public hearings of the Collection Review Committee, and no appeals process when the Collection Review Committee has deemed a book inappropriate and unsuitable for Llano County library shelves.

109.    In addition, the New Library Board has tasked itself with creating and implementing an amended library materials collection policy (*i.e.*, the library's official set of procedures dictating how new books are purchased and how old books are weeded) without seeking or intending to seek approval from the Commissioners Court. In or about January 2022, the New Library Board instructed Defendant Milum and Llano County librarians that all new books must be presented to and pre-approved by the New Library Board before they can be purchased or placed on library shelves.

110.    On January 28, 2022, for example, Defendant Milum emailed the Lakeshore head librarian stating, "If you have a book list ready to be ordered let me know. I have to send them to the board for review."

111.    Although Llano County librarians have presented tentative book purchase lists to the New Library Board since implementing its book-approval requirement, the New Library Board has yet to actually approve any proposed or requested books. No new library books have been purchased for Llano County's library collection since October 2021.

112.    For New Library Board decisions that have actually been presented to the Commissioners Court for review, such as the newly implemented New Library Board bylaws, the Commissioners have routinely adopted and "rubber stamped" decisions made by the New Library Board without exercising any independent judgment or discretion.

**J.      Defendants Bar the Public from Attending New Library Board Meetings**

113.    For decades, Llano County's prior library boards held their meetings in public and welcomed public comment and participation.

114.    In early 2022, the New Library Board's initial meetings, which took place in library meeting rooms, were also open to the public. That soon changed.

115.    On January 19, 2022, Defendant Wells emailed Defendant Moss about the New Library Board meeting that took place that day, stating: "There were three or four patrons present and taking notes. That surprised a few of us. Would you be able to persuade Judge Cunningham to keep the meetings closed and only include appointed board members, bringing in Amber [Milum] when we need clarification, etc.[?] (Cheryll Mabray (Precinct 1) brought this up and most agreed with her.)."

116.    On February 14, 2022, Defendant Cunningham sent an email to members of the New Library Board, stating: "please remember that you are not obligated to having a public comment component in your meetings." In the same email, Defendant Cunningham also banned staff librarians from attending New Library Board meetings. Defendant Milum passed this message onto the other County librarians, informing them by email that "[s]taff members are not to attend [Library] Board meetings. You may not use your vacation time to attend."

117.    Three days later, at its February 17, 2022 meeting, the New Library Board stopped allowing public comments.

118.    On March 3, 2022, the New Library Board held a meeting to discuss whether it was subject to the requirements of the Texas Open Meetings Act ("TOMA") and the Texas Public Information Act ("TPIA"). The Board concluded that it would not be subject to these laws because it was now an "advisory," not a governmental, body.

119.    During the meeting, a member of the New Library Board asked whether meeting notes taken by Defendant Milum would be considered public record, as she was the only County library staff member allowed to attend the New Library Board's meetings. When Defendant Wallace learned that the answer was yes, Defendant Milum's notes could become a public record subject to the TPIA, Defendant Wallace responded: "Take her pen."

120.    Near the end of the meeting, Defendant Schneider made a motion to make all future Library Board meetings private. The New Library Board approved it unanimously, breaking with the decades-long tradition of prior library boards and successfully closing all future meetings to the public.

### K.    Defendants Withhold County Employee Communications

121.    Pursuant to the TPIA, Plaintiffs asked for all correspondence between Defendant Milum and library staff from February 12, 2022, through February 17, 2022.

122.    Defendants did not produce all responsive correspondence, in violation of the TPIA. Plaintiffs learned of at least one responsive email from another source—an email that Defendants had not produced in response to Plaintiffs' TPIA requests.

123.    Further, the County has wholly refused to produce any communications between, or records created by, members of the New Library Board.

124.    Defendants' violations of the TOMA and TPIA provide additional evidence of their intent to censor and conceal the facts underlying their unconstitutional actions.

### L.    Defendants Fire Dissenting Librarian Suzette Baker

125.    From the very start of Defendants' censorship campaign, the head of the Kingsland Library Branch, Suzette Baker, refused to abide by Defendants' unconstitutional orders—a decision that ultimately cost her her job.

126.     Each time Defendant Milum directed Ms. Baker to move children's books into the adult section of the library, remove books on the Bonnie Wallace Spreadsheet from library shelves, or otherwise do Defendants' censorship bidding, Ms. Baker said no.

127.     For example, in or about mid-November 2021, Defendant Milum ordered Ms. Baker to remove all titles on the Bonnie Wallace Spreadsheet from the Kingsland Library Branch shelves. Ms. Baker refused and told Defendant Milum that removing these books would constitute censorship. Ms. Baker also told Defendant Milum that she should consult with the county attorney because Milum's actions and orders were illegal and in violation of the First Amendment.

128.     On another occasion, Ms. Baker discovered that Defendant Milum had removed *How to Be an Anti-Racist*—a book on the Krause List and on the derivative Bonnie Wallace Spreadsheet—from the Kingsland Library Branch shelves and hid it behind the front desk. Ms. Baker immediately put the book back on the shelves.

129.     Ms. Baker, a book lover with a quick wit, was well known in Kingsland for the quippy signs she would put on the library message board out front to attract visitors.

130.     In or about February 2022, Ms. Baker put up one such sign in front of the Kingsland Library that said, "We put the 'lit' in literature." This sign had a double meaning. "Lit" referred to the slang word for cool or fun, and also referenced the recent book burning that happened in Tennessee.

131.     Inside the library, Ms. Baker set up a display of books next to a sign that said, "Come check out our 'lit' books!" The book display contained an assortment of historically banned books like *1984*, *To Kill a Mockingbird*, and *Fahrenheit 451*. It also had some of the books from the Bonnie Wallace Spreadsheet that she had been ordered—and refused—to remove, including *How to Be an Anti-Racist* and *Between the World and Me*.

132.     The next day, Defendant Milum came to the Kingsland Library and ordered Ms. Baker to take down the message board sign and corresponding book display. Defendant Milum

told Ms. Baker to remove the books from the Bonnie Wallace Spreadsheet from the display, and to put a replacement sign over the remaining books entitled, "Classics."

133.    On February 9, 2022, Ms. Baker received a verbal warning from Defendant Milum for insubordination after attending the first two New Library Board meetings, both of which were held in public meeting rooms in the Kingsland Library where she worked.

134.    On March 9, 2022, Defendant Milum fired Ms. Baker for the alleged offenses of "insubordination," "creating a disturbance," "violation of policies," and "allowing personal opinions to interfere with job duties and procedures."

### M.    Plaintiffs Are Suffering Immediate and Irreparable Harm

135.    Each day that Plaintiffs are deprived of their right of access to the Banned Books and OverDrive, they suffer immediate and irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

136.    Without success, Plaintiffs have attempted to locate and check out the Banned Books that Defendants have censored, including but not limited to, the Health Education Picture Books, *In the Night Kitchen*, *It's Perfectly Normal*, *Caste*, *They Called Themselves the K.K.K*, *Spinning*, and *Being Jazz*. Plaintiffs wish to exercise their First Amendment rights to access and receive information, but they are unable to do so because Defendants have removed the Banned Books and many others from the collection catalog and library shelves.

137.    Also without success, Plaintiffs have attempted to access OverDrive using their Llano County library cards. Plaintiffs wish to exercise their First Amendment rights to access and receive information in the ebooks and audiobooks on OverDrive, but they are unable to do so because Defendants have permanently terminated OverDrive access for all Llano County library cardholders.

## CLAIMS FOR RELIEF

### Count One: 42 U.S.C. § 1983, Violation of First Amendment – Viewpoint Discrimination

138.    All prior paragraphs are incorporated here by reference.

139.    The First Amendment binds the State of Texas pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

140.    The First Amendment protects the right to access and receive information and ideas. *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997).

141.    This right is "vigorously enforced in the context of a public library, the 'quintessential locus of the receipt of information'" and the free marketplace of ideas. *Sund v. City of Wichita Falls, Texas*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000) (quoting *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992)).

142.    Viewpoint discrimination is censorship based on a government actor's subjective judgment that the content of protected speech is offensive or inappropriate. Viewpoint discrimination is the most pernicious and egregious type of content-based suppression.

143.    Defendants removed the Banned Books from library shelves and permanently terminated access to OverDrive for the entire County because Defendants subjectively disliked the content of the Banned Books.

144.    Defendants removed the Banned Books on the basis of their message and content for the specific purpose of suppressing and censoring public access to the ideas and information contained within them.

145.    Defendants issued a moratorium on all new book purchases to ensure that all new books added to the Llano County library collection would comport with Defendants' subjective beliefs, tastes, and values.

146.    Defendants issued this book purchase moratorium for the specific purpose of suppressing and censoring public access to ideas and information which they subjectively disagree with or dislike.

147.    Defendants' removal of the Banned Books, permanent termination of OverDrive access, and moratorium on all new book purchases thus constitutes impermissible and

unconstitutional content-based and viewpoint-based discrimination in violation of Plaintiffs' First Amendment rights.

148. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to access and receive information and ideas.

**Count Two: 42 U.S.C. § 1983, Violation of Fourteenth Amendment – Due Process**

149. All prior paragraphs are incorporated here by reference.

150. The essential requirements of due process are proper notice and an opportunity to be heard. Here, Plaintiffs had neither.

151. Defendants deprived Plaintiffs of their constitutional right to access and receive information and ideas by removing the Banned Books and permanently terminating OverDrive access without providing any prior notice.

152. Defendants did not provide Plaintiffs with an opportunity to be heard—either at a meeting of the Library Board or in any other public forum—before the removal of the Banned Books and permanent termination of OverDrive occurred.

153. In fact, Defendants affirmatively opted to ensure that Plaintiffs would never have notice and an opportunity to be heard by closing Library Board meetings to the public and thereby barring Plaintiffs from attending all future meetings.

154. Defendants also violated Plaintiffs due process rights by failing to create and implement any mechanism for members of the public to appeal the removal of books from library shelves, including specifically with respect to the removal of the Banned Books and the permanent suspension of OverDrive.

155. The Texas Open Meetings Act requires that Defendants make the meetings of the Library Board open to the public. *See* Tex. Gov't Code §§ 551 et seq.

156. The Texas Open Meetings Act also prescribes notice and hearing requirements that Defendants have failed to follow. By failing to comply with the Texas Open Meetings Act, Defendants have also violated Plaintiffs' Fourteenth Amendment due process rights.

157.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment due process rights.

158.    In particular, Plaintiffs will continue to suffer future deprivation of their constitutional right to access and receive information and ideas if the New Library Board is permitted to continue conducting its meetings in private, issuing library policies and procedures in private and without the approval of the County Commissioners, exercise complete authority over new book purchases, and review book challenges in private without notice or a hearing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

(a)    Declaratory relief stating that Defendants have violated Plaintiffs' First and Fourteenth Amendment rights;

(b)    Injunctive relief that is tailored to remedy the specific violations determined on the merits of Plaintiffs' First and Fourteenth Amendment claims;

(c)    Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(d)    Any such other relief as this Court deems just and proper.


Dated:  April 25, 2022                    Respectfully Submitted,

                                          **BRAUNHAGEY & BORDEN LLP**

                                          /s/ *Ellen V. Leonida*
                                          Ellen V. Leonida (CA Bar No. 184194)*
                                          Matthew Borden (CA Bar No. 214323)*
                                          J. Noah Hagey (CA Bar No. 262331)*
                                          Sarah Salomon (CA Bar No. 308770)*
                                          Pratik Ghosh (NY Registration No. 5754940)*
                                          Amy Senia (CA Bar No. 329134)*
                                          **BraunHagey & Borden LLP**
                                          351 California Street, 10th Floor
                                          San Francisco, CA 94104
                                          Tel & Fax:  415-599-0210
                                          leonida@braunhagey.com
                                          borden@braunhagey.com

hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

*Attorneys for Plaintiffs*
*\*Pro hac vice forthcoming*

**WITTLIFF | CUTTER PLLC**

/s/ *Ryan A. Botkin*
Ryan A. Botkin (TX Bar No. 00793366)
Katherine P. Chiarello (TX Bar No. 24006994)
María Amelia Calaf (TX Bar No. 24081915)
**Wittliff | Cutter PLLC**
1209 Nueces Street
Austin, Texas 78701
Tel: 512-960-4730
Fax: 512-960-4869
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com